UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X

BRENDA PRINCE,

                              Plaintiff,

              -against-                                    **MEMORANDUM & ORDER**

                                                          **14-CV-5695 (NGG)**

CAROLYN W. COLVIN,
Commissioner of Social Security

                              Defendant.
--------------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

Pro se Plaintiff Brenda Prince brings this action pursuant to 42 U.S.C. §§ 405(g)

and 1383(c), seeking judicial review of the Social Security Administration's (the "SSA")

decision that she is not disabled and therefore, does not qualify for Social Security Disability and

Supplemental Security Income benefits. Defendant Carolyn W. Colvin, the Commissioner of

Social Security, (the "Commissioner") has filed a motion, and Plaintiff has filed a cross motion,

for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (See Def.'s

Not. of Mot. (Dkt. 15); Pl.'s Opp'n & Mot. for J. on Pleadings ("Pl.'s Opp'n") (Dkt 17).) For the

reasons set forth below, the Commissioner's motion is GRANTED and Plaintiff's cross-motion

is DENIED.

## I.    BACKGROUND

### A.    The Administrative Law Judge's Decision

Plaintiff claims that she is disabled because she suffers from a number of impairments

that have prevented her from engaging in substantial gainful activity since January 31, 2012.

(See Administrative R. ("R.") (Dkt. 7) at 13.) These impairments include: cervical arthritis and

levoscoliosis, chronic lumbar pain related to a lumbar strain, obesity, depression, hypertension,

hyperlipidemia, vitamin D deficiency, diabetes, astigmatism, dry eyes, bilateral knee pain, anxiety, anemia, and an abdominal disorder. (Id. at 13-14.) The Administrative Law Judge ("ALJ") found that only her cervical arthritis, levoscoliosis, chronic lumbar pain, obesity, and depression were significant enough to be classified as severe impairments. (Id. at 13.) However, the ALJ determined that these impairments did not meet or equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 14-19.) The ALJ considered Plaintiff's ailments and background when determining which jobs Plaintiff could still perform, and made a ruling that Plaintiff could work as a parking lot attendant, a price marker, or a ticket seller. (Id. at 20.) When making this decision, the ALJ took into account Plaintiff's claims of pain and numbness when sitting or standing for too long and included a 30 minute sit/stand option in his ruling. (Id. at 17, 20.)

**B.    Factual Background**

Plaintiff was born on September 19, 1961. (Id. at 19.) She has a high school education. (Id. at 19.) From 1987 until January 1, 2001, Plaintiff was employed as a home health aide. (Id. at 127.) On January 1, 2001, Plaintiff stopped working as a home health aide because she needed to take care of her disabled daughter. (Id. at 135.) Plaintiff believes her conditions became severe enough to keep her from working on January 1, 2007. (Id. at 135.) The relevant conditions developed over the span of several years include: cervical arthritis and levoscoliosis, chronic lumbar pain related to a lumbar strain, obesity, and depression. (Id. at 13.)

1.    Relevant Medical Evidence Prior to Plaintiff's January 31, 2012
      Supplemental Security Income Application

Prior to the filing of her Supplemental Security Income ("SSI") application, Plaintiff was treated for hypertension, obesity, diabetes, vision problems, and depression. (Id. at 238.) On May 11, 2007, Plaintiff was diagnosed with uncontrolled hypertension and obesity by her then

2

primary physician, Dr. Harris-Davis. (Id. at 240.) On March 5, 2008, Dr. Harris-Davis noted that Plaintiff had a history of hypertension and headaches, though the headaches had stopped. (Id.) At this time, Plaintiff's hypertension was uncontrolled; accordingly, Dr. Harris-Davis discussed treating Plaintiff's obesity with diet and weight loss. (Id.) Plaintiff had numerous follow up visits with Dr. Harris-Davis from March 2008 through June 2008. (Id. at 263, 281, 284, 289.) However, her hypertension was never controlled. (Id.)

On October 1, 2008, Plaintiff saw Dr. Sandra Robinson who discussed diet and weight loss with her. (Id. at 298.) Dr. Robinson noted that Plaintiff's hypertension was under control. (Id. at 301.) Plaintiff's weight had decreased from 287 to 273 pounds. (Id.) Plaintiff saw Dr. Robinson again on March 23, 2009, and had no specific medical complaints. (Id. at 307.) Nonetheless, Dr. Robinson noted Plaintiff's obesity and hypertension remained a concern. (Id.)

Plaintiff saw a nutritionist on April 8, 2009; the nutritionist characterized Plaintiff's hypertension as borderline. (Id. at 308.) At the time, Plaintiff weighed 270 pounds and she was instructed on proper nutrition. (Id.)

On December 18, 2009, Plaintiff visited the Interfaith Medical Center seeking treatment for her hypertension. (Id. at 321.) She met with Dr. Inna Grishina, who became her new primary care doctor and who was her treating physician when she applied for Social Security Disability benefits. (Id. at 432-33.) Dr. Grishina diagnosed Plaintiff with hypertension and morbid obesity. (Id. at 322.) Dr. Grishina recommended a low cholesterol diet and a dietary evaluation. (Id.) On February 9, 2010, Plaintiff returned to Dr. Grishina for a follow up visit. (Id. at 328.) Dr. Grishina noted that Plaintiff had hyperlipidemia and uncontrolled hypertension. (Id. at 328.) He also noted that she had a vitamin D deficiency, diabetes, and that her obesity was still a concern. (Id. at 329.)

On February 19, 2010, Plaintiff visited the Interfaith Medical Center complaining of high blood pressure. (Id. at 342.) She met with Dr. Zewge Deribe, an attending physician at the center, who noted that Plaintiff had borderline diabetes, which could be diet-controlled. (Id. at 347.) Plaintiff reported that she felt comfortable and had occasional headaches. (Id.) Dr. Deribe indicated that Plaintiff's hypertension was uncontrolled and that Plaintiff had dyslipidemia and obesity. (Id. at 348.) Dr. Deribe further noted that Plaintiff, who was already on the cholesterol-lowering drug, Lipitor, should increase her dosage. (Id.) Plaintiff was also advised by Dr. Deribe to take this Lipitor at the same time each night. (Id. at 352.)

On March 5, 2010, Plaintiff returned to Dr. Grishina at the Interfaith Medical Center for a follow up visit; Plaintiff had no complaints. (Id. at 363.) Nonetheless, Dr. Grishina recommended a referral to a dietician. (Id. at 364)

Throughout 2010, Plaintiff continued treatment at the Interfaith Medical Center for hypertension, obesity, astigmatism, and diabetes. (Id. at 368-425.) She continued to be borderline diabetic and exhibited symptoms of hypertension. (Id. at 371.) On May 6, 2010, Plaintiff saw Dr. Lamont Freeman complaining of blurry vision and difficulty seeing far distances. (Id. at 375.) She was diagnosed with astigmatism and myopia. (Id.) Throughout the remainder of 2010 and into 2011, Plaintiff continued to see Dr. Grishina. (Id. at 389-420.) Plaintiff had no specific complaints but she remained obese and was advised to take her blood pressure medication as prescribed. (Id. at 394.)

On July 15, 2011, Plaintiff saw Dr. Gopal Kaza, an attending physician at the Interfaith Medical Center. (Id. at 419.) Although Dr. Kaza noted Plaintiff's history of hypertension, Dr. Kaza found that her hypertension was under control. (Id. at 420.) Dr. Kaza spoke to Plaintiff about medicine compliance because Plaintiff appeared to have a tendency of not taking her blood

pressure medication as prescribed. (Id. at 420.) Plaintiff saw Dr. Kaza at a follow up visit on October 14, 2011. (Id. at 424.) Dr. Kaza noted Plaintiff's hypertension, dyslipidemia, glucose intolerance, and obesity remained unchanged. (Id. at 425.)

2.      Relevant Medical Evidence From the Date of Plaintiff's SSI Application Until the Date that Plaintiff's SSI Application was Denied by the ALJ

a.      Evidence Related to Plaintiff's Physical Impairments

Plaintiff visited Dr. Grishina on February 10, 2012. (Id. at 432-33.) Dr. Grishina noted a swelling in Plaintiff's extremities, which Dr. Grishina classified as edema. (Id. at 433.) But Dr. Grishina also observed that Plaintiff's hypertension, dyslipidemia, and glucose intolerance were under control. (Id.) On March 9, 2012, Dr. Grishina noted that Plaintiff's hypertension was controlled by medication and her hyperlipidemia was stable on Lipitor. (Id. at 442.) Plaintiff was again counseled concerning her obesity, exercise, and diet. (Id.)

On April 10, 2012, Dr. Jerome Caiati, a doctor hired by the Commissioner of Social Security to examine Plaintiff, conducted an examination. (Id. at 193-96.) Dr. Caiati noted Plaintiff's history of hypertension since 1982, diabetes since 1998, and more recently a history of hyperlipidemia, anemia, depression, astigmatism, vitamin D deficiency, bilateral knee pain, and an unspecified abdominal disorder. (Id. at 193.) At the time, Plaintiff, who was five feet four inches tall, weighed 272 pounds. (Id.) Plaintiff reported to Dr. Caiati that she could cook, clean, and do laundry. (Id.) She showered, bathed, and dressed herself. (Id.) She reported that she spent time watching television and reading. (Id.) During the examination, Plaintiff was in no acute distress and was able to accomplish the tasks Dr. Caiati asked her to perform. (Id. at 194.) Specifically, Plaintiff walked with a normal gait and stance, used no assistive devices, and could walk on her heels and toes without difficulty. (Id.) She could fully squat while holding the examination table for assistance and had no difficultly rising from a chair, changing for the

5

examination, or getting on and off the examination table. (Id.) Plaintiff had normal range of motion in her cervical spine, shoulders, elbows, forearms, and wrists. (Id. at 194-95.) Plaintiff had normal deep reflexes, no sensory deficits, and full strength in her extremities. (Id.) Dr. Caiati opined that Plaintiff could sit, stand, walk, reach, push, pull, lift, climb, and bend without restriction. (Id. at 196.)

On May 11, 2012, Plaintiff returned to Dr. Grishina for a follow up. (Id. at 448-49.) Her hypertension was moderately controlled and her hyperlipidemia was stable on Lipitor. (Id. at 449.) Dr. Grishina reported that Plaintiff was well-motivated with respect to her obesity and had lost six pounds since her last visit. (Id.) Dr. Grishina opined that, due to pain in Plaintiff's legs and tiredness, Plaintiff was limited to walking less than two blocks at a time. (Id. at 448.) During a follow up visit with Dr. Grishina on August 10, 2012, Plaintiff complained of migraines. (Id. at 455.) Accordingly, Plaintiff was referred to a neurologist. (Id. at 456.) Dr. Grishina noted that Plaintiff had been taking the medication Fluoxetine for depression. (Id.)

Plaintiff saw Dr. Bordes Laurent, a neurologist, on January 17, 2013. (Id. at 462.) Plaintiff complained of headaches and blurred vision. (Id.) Plaintiff further stated that she slept poorly and was stressed because she was caring for her autistic child. (Id.) She also complained of musculoskeletal pain, but she was able to walk about freely. (Id. at 462-63.) Dr. Laurent recommended weight reduction, hydrotherapy, aromatherapy, and physical therapy. (Id. at 463.)

On January 8, 2013, Dr. Min Shen, a physician at the Interfaith Medical Center, had ordered X-rays of Plaintiff's cervical spine on behalf of Plaintiff's treating physician, Dr. Grishina. (Id. at 483-84.) Plaintiff saw Dr. Luis Cruz on January 30, 2013, seeking treatment for neck and back pains. (Id. at 470, 502.) Plaintiff reported that her neck and back pains would begin spontaneously and could last for hours. (Id. at 502.) She rated her pains a four on a scale

6

from one to ten. (Id.) Dr. Cruz did not observe any problems with Plaintiff's right or left extremities. (Id. at 503-04.) Dr. Cruz recommended physical therapy three times per week. During Plaintiff's appointment with Dr. Cruz, he reviewed Plaintiff's cervical X-rays taken on January 8, 2013. (Id. at 483-84.) The X-rays revealed straightening of the curvature of the spine, small anterolisthesis at the C6-C7 level, and arthritic changes. (Id. at 483-84.) There were no fractures or compression and the prevertebral space was unremarkable. (Id. at 483.)

On March 6, 2013, Plaintiff saw Dr. Cruz for a follow up visit. (Id. at 491.) He reported that she had been going to physical therapy for chronic neck and lower back pains between February 4, 2013, and February 25, 2013. (Id. at 491-501.) Plaintiff reported improvements in her lower back, though she continued to complain of neck pain and stiffness. (Id. at 491.) Dr. Cruz noted that Plaintiff needed to continue physical therapy. (Id.)

Plaintiff was seen by Dr. Laurent for a follow up visit on March 26, 2013. (Id. at 558.) She complained of bilateral hand numbness over the left side of her body but denied other complaints, including headaches. (Id.) Examination of the neck revealed it was supple without tenderness. (Id.) Dr. Laurent diagnosed musculoskeletal pains and cervical anterolisthesis at the C6-C7 level. (Id.)

b.      Evidence Related to Plaintiff's Mental Impairments

Dr. Michelle Bornstein, a psychologist, conducted a consultative psychiatric examination on April 10, 2012, on the behalf of the Commissioner of Social Security to assess Plaintiff's alleged depression. (Id. at 189-92.) Plaintiff reported no psychiatric history. (Id. at 189.) Plaintiff stated that she could dress, bathe, groom herself, cook, clean, do laundry, shop, manage her money, and take public transportation. (Id. at 191.) She did not have any close friends, but was close with her family. (Id.) Plaintiff reported difficulty falling asleep, loss of appetite,

dysphoric moods, crying spells, loss of usual interests, and social withdrawal over the previous two years. (Id. at 189.) She denied suicidal ideation, plan, or intent. (Id.) Dr. Bornstein did not find any evidence of anxiety, panic attacks, manic symptoms, thought disorder symptoms, or cognitive deficits. (Id.) During the examination, Plaintiff was cooperative and demonstrated an adequate manner of relating, social skills, and overall presentation. (Id. at 190.) Dr. Bornstein noted that Plaintiff's motor behavior was normal and her eye contact was appropriate. (Id.) Likewise, her thought processes were coherent and goal directed. (Id.) The doctor wrote that Plaintiff's mood and affect were dysphoric. (Id.) Additionally, Dr. Bornstein noted that her sensorium was clear and that she was fully oriented. (Id.) Dr. Bornstein further stated that Plaintiff's concentration and recent and remote memory skills were intact, and her cognitive functioning was in the low average range. (Id.) Dr. Bornstein concluded that Plaintiff demonstrated fair insight and judgment. (Id.)

Dr. Bornstein diagnosed Plaintiff with major depressive disorder, mild. (Id. at 191.) She opined that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress. (Id.)

On May 9, 2012, Dr. Kennedy-Walsh, a psychiatric consultant, reviewed the evidence in the record and concluded that Plaintiff's affective disorder was not a medically severe impairment. (Id. at 197-210.) Dr. Kennedy-Walsh found that Plaintiff had no restrictions of activities of daily living, or maintaining concentration, persistence, or pace. (Id. at 207.) Although Plaintiff had mild difficulties in maintaining social functioning, she never had repeated episodes of deterioration. (Id.)

3.    Evidence Submitted to the SSA's Appeals Council After the ALJ
       Rendered His Decision

On July 2, 2012, Dr. Le-Ben Wan, a psychiatrist at Community Counseling and

Mediation, assessed Plaintiff for mental health treatment. (Id. at 580-87.) Plaintiff complained

of a depressed mood stemming from the murder of her nephews (four years earlier) and a

burglary (one year earlier). (Id. at 580.) Her mood had been up and down with more bad days

than good. (Id.) On bad days, Plaintiff had symptoms of social withdrawal, anhedonia, low

energy, poor sleep, poor appetite, and poor concentration. (Id.) Plaintiff stated that she had last

worked in 2000, due to difficulty finding a job and because she had to care for her autistic

daughter. (Id. at 583.) Plaintiff lived alone and took care of her daughter. (Id.) Dr. Wan

diagnosed Plaintiff with a major depressive disorder or adjustment disorder, chronic, with

depressed mood; he assessed a global assessment of function ("GAF") of 55.[1] Dr. Wan

recommended unspecified medication and weekly psychotherapy as means of addressing her

depression. (Id. at 586-87.)

On August 4, 2012, Plaintiff returned to Dr. Wan. (Id. at 579.) Plaintiff complained of a

depressed mood and reported visual hallucinations several times per day. (Id.) Dr. Wan

prescribed Prozac. (Id.) Plaintiff missed several scheduled appointments with Dr. Wan before

seeing him again on February 2, 2013. (Id. at 578.) Plaintiff reported that her visual

hallucinations had stopped, but that she had a dysphoric mood. (Id.) She also reported stress

from caring for her autistic daughter. (Id.) The remainder of her mental status examination was

normal. (Id.) On March 2, 2013, Plaintiff returned to Dr. Wan with a stable and improved

mood. (Id. at 577.) Plaintiff saw Dr. Wan for follow up on April 4, 2013, and May 11, 2013.

---

[1] GAF is a measure of overall psychological functioning on a scale of 0 to 100; a GAF between 51 and 60 indicates
moderate symptoms or moderate difficulty in social, occupational, or school functioning. (See Def.'s Mem. at 10
n.3.)

(Id. at 577-76.) At those appointments Plaintiff no longer reported a depressed mood, and her mental status examination remained unremarkable. (Id. at 575-76.)

4. Evidence Submitted to the District Court After the Appeals Council Denied Plaintiff's Appeal

On December 11, 2015, Plaintiff went to the Brooklyn Hospital Center, where she was treated for post-menopausal bleeding and urinary incontinence. (Pl.'s Opp'n. at 2, 9.) Dr. Haroutyoun Margossian saw Plaintiff on July 28, 2014, and on September 15, 2014, regarding Plaintiff's urinary incontinence. (Id. at 9.) Dr. Margossian reported surgery had been scheduled but Plaintiff cancelled the surgery. (Id.)

Plaintiff included in her brief, progress notes from doctors at the Interfaith Medical Center and Dr. Cruz to indicate that she has continued seeing her neurologist for lumbar and cervical degenerative joint disease, her opticians for eye care, and her physical therapist for physical therapy sessions. (Id.)

5. Non-Medical Evidence

a. Plaintiff's Testimony

Before her hearing, Plaintiff completed a function report on April 6, 2012. (R. at 144-54.) Plaintiff reported that she shops by phone and mail several times per month, and it takes her several hours. (Id. at 144.) She is able to pay bills, count change, and manage a savings account. (Id.) Her conditions have not affected her ability to handle money, nor have they affected her hobbies of reading, watching television, and doing puzzles. (Id.) Plaintiff reported that she does not go out regularly. (Id. at 145.) She also reported that she cannot lift anything heavy or stand for a long period of time. (Id.) Plaintiff wears prescription glasses 24 hours a day because she is far-sighted. (Id. at 146.) She is able to walk one half block before she has to rest for about 45 minutes. (Id.) She is able to follow written and verbal instructions and

10

can finish what she starts. (Id.) She reported she is able to sit for about an hour and that she has a hard time climbing stairs. (Id. at 147.) She is not able to kneel due to knee pain. (Id.) She can use her hands, though they sometimes feel numb. (Id.) Plaintiff reported that personal care and light chores take longer than they used to. (Id. at 149.) Her back pain, obesity, and numbness in her extremities limited her ability to do chores and her anxiety interfered with her sleeping. (Id.) She also reported trouble remembering things and that she would get anxiety attacks where her heart rate increased and she would sweat a lot. (Id. at 152-53.)

During the June 10, 2013, hearing before Administrative Law Judge Jonathan Baird (the "ALJ"), Plaintiff testified that she worked as a home health aide from 1997-2001, but stopped working to take care of her autistic daughter full time. (Id. at 36, 39.) She added that she also stopped working because of a lack of work and her health issues. (Id. at 38-39.) Plaintiff testified that she did not currently work because of the numbness in her fingers and thighs, and because she could not walk for a long period of time without stopping to rest. (Id. at 37-38.) She indicated that she had lower back and neck pains, and that she could not go back to her past work as a home health aide because it was too physically strenuous. (Id. at 38-39, 46.)

Plaintiff testified that she could walk for approximately one half block before she had to stop and rest, but she also testified that she walked three to five blocks to the store. (Id. at 40, 42.) She approximated that she could stand for 30 minutes and that if she sat for too long her feet and thighs became numb. (Id. at 40.) Plaintiff stated she could bend over, but it caused pain. (Id. at 41.) She also testified that she had been taking Prozac, which had helped her with depression, caused by the death of her two nephews. (Id. at 45.)

b.    Vocational Expert: Larry Takki

Larry Takki, a vocational expert, also testified at Plaintiff's hearing. (Id. at 48.) The ALJ

posed a hypothetical question to Mr. Takki, describing an individual of Plaintiff's age,

educational background, and work background, who could perform only light work and could

only occasionally climb ramps and stairs, stoop, kneel, crouch, or crawl. (Id. at 49.) This

hypothetical individual could not climb ladders, roofs, or scaffolds; bend or stand; or carry out or

remember detailed instructions. (Id.) Mr. Takki testified that such an individual could not

perform Plaintiff's past work as a home health aide, because work as a home health aide is semi-

skilled work, but could perform the jobs of parking lot attendant, price marker, and ticket seller.

(Id. at 49-50.) Mr. Takki also stated that an individual with all of the above limitations, but who

would also require an option of alternating sitting and standing every 30 minutes, could do the

same jobs. (Id. at 50-51.)

## II.    PROCEDURAL HISTORY

On January 31, 2012, Plaintiff filed an application for Social Security Disability Benefits,

claiming that she had been disabled since January 1, 2007. (Id. at 11.) The SSA denied the

application on May 11, 2012. (Id.) Plaintiff filed a written request for a hearing on

June 29, 2012. (Id.) On June 10, 2013, the ALJ held a video hearing, in which Plaintiff

appeared in Brooklyn, New York, and the ALJ presided over the hearing from Lawrence,

Massachusetts. Larry Takki, an impartial vocational expert, also appeared at the hearing, in

Massachusetts. (Id.) On July 26, 2013, the ALJ issued a written decision concluding that

Plaintiff was not disabled within the meaning of the Social Security Act, and denying Plaintiff's

application for Social Security Disability Benefits. (Id. at 21.) Plaintiff requested that the SSA

Appeals Council review the ALJ's unfavorable decision, and the Appeals Council denied the request for review on July 25, 2014, upholding the ALJ's decision. (Id. at 1-4.)

On September 25, 2014, Plaintiff filed the instant action seeking judicial review of the SSA's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (See Compl. (Dkt. 1) ¶¶ 1-2.) The Commissioner filed her Answer on July 20, 2015. (See Ans. (Dkt. 8).)

## III. LEGAL STANDARD

### A. Review of Final Determinations of the Social Security Administration

Under Rule 12(c), "a movant is entitled to judgment on the pleadings only if the movant establishes 'that no material issue of fact remains to be resolved and that [she] is entitled to judgment as a matter of law.'" Guzman v. Astrue, No. 09-CV-3928, 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting Juster Assocs. v. City of Rutland, 901 F.2d 266, 269 (2d Cir. 1990)). "The role of a district court in reviewing the Commissioner's final decision is limited." Pogozelski v. Barnhart, No. 03-CV-2914 (JG), 2004 WL 1146059, at *9 (E.D.N.Y. May 19, 2004). "[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). Thus, as long as (1) the ALJ applied the correct legal standard, and (2) the ALJ's findings are supported by evidence that a reasonable mind would accept as adequate, the ALJ's decision is binding on the court. See

### B. Determination of Disability

"To receive federal disability benefits, an applicant must be 'disabled' within the meaning of the Social Security Act." Shaw, 221 F.3d at 131; see also 42 U.S.C. § 423. A claimant is "disabled" within the meaning of the Social Security Act if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

The SSA has promulgated a five-step procedure for determining whether a claimant is "disabled" under the Social Security Act. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). In Dixon v. Shalala, the Second Circuit described this five-step analysis as follows:

> The first step in the sequential process is a decision whether the claimant is engaged in "substantial gainful activity." If so, benefits are denied.
>
> If not, the second step is a decision whether the claimant's medical condition or impairment is "severe." If not, benefits are denied.
>
> If the impairment is "severe," the third step is a decision whether the claimant's impairments meet or equal the "Listing of Impairments" set forth in . . . the social security regulations. These are impairments acknowledged by the [SSA] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the "listed" impairments, he or she is conclusively presumed to be disabled and entitled to benefits.
>
> If the claimant's impairments do not satisfy the "Listing of Impairments," the fourth step is assessment of the individual's residual functional capacity," i.e., his capacity to engage in basic

work activities, and a decision whether the claimant's residual functional capacity permits him to engage in his prior work. If the residual functional capacity is consistent with prior employment, benefits are denied.

If not, the fifth and final step is a decision whether a claimant, in light of his residual functional capacity, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." If not, benefits are awarded.

54 F.3d 1019, 1022 (2d Cir. 1995) (internal citations omitted).

The "burden is on the claimant to prove that he is disabled." Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) (internal citation and quotation marks omitted). But if the claimant shows at step four that his impairment renders him unable to perform his past work, there is a limited shift in the burden of proof at step five that requires the Commissioner to "show there is other gainful work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

In making the determinations required by the Social Security Act and the regulations promulgated thereunder, "the Commissioner must consider (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Pogozelski, 2004 WL 1146059, at *10 (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)). Moreover, "the ALJ conducting the administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits." Id.

## IV. DISCUSSION

Plaintiff alleges that the ALJ erred in concluding that she was not disabled under the Social Security Act because he did not have all of her medical history in evidence. (See Pl.'s Opp'n.) Plaintiff attached a few doctor notes indicating that she was still receiving treatment for various maladies. However, all of the evidence Plaintiff submitted post-dates the ALJ's decision of July 26, 2013. (R. at 8-25.) A court may order the Commissioner to consider additional evidence submitted for the first time to the district court, "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." 42 U.S.C. § 405(g); see also Schaal v. Apfel, 134 F.3d 496, 506 (2d Cir. 1998). Evidence is material if it is both "relevant to the claimant's condition during the time period for which benefits were denied" and there is "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." See Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1998).

However, the majority of the evidence that Plaintiff submitted is cumulative, and therefore, would not have influenced the ALJ to rule differently. Evidence is considered new if it is "not merely cumulative of what is already in the record." Id. at 597. Plaintiff included progress notes from doctors she was already seeing during her SSI application period. However, these progress notes do not change the facts of her condition during the relevant time period, in which she applied for and was denied benefits. Similarly, even though there is a summary of a cervical spine X-ray taken on January 8, 2013, (see Pl.'s Opp'n at 5), which would be during the relevant period, this X-ray is already contained in the record (see R. at 483-84) and was reviewed by the ALJ. All of this evidence is merely cumulative because it reiterates and summarizes the

same notes from doctors she has been seeing for the past few years, for the same conditions. There is no new evidence added through these notes and the X-ray.

Plaintiff submitted some new evidence regarding her urinary incontinence and post-menopausal bleeding. However, that evidence is not material to her condition during the relevant time period because it reflects symptoms and medical problems that Plaintiff developed after the ALJ's decision became final. See Frye ex rel. A.O. v. Astrue, 485 Fed. App'x. 484, 485 n.1 (2d Cir. 2012) (relevant period in SSI claim is between the plaintiff's application date until the ALJ's decision). Plaintiff submitted new evidence that did not correspond to any of the medical problems she was experiencing during the time she filed her SSI claim. Because Plaintiff's medical issues regarding urinary incontinence are not relevant to her condition during that time period, this information is not material evidence, even if it is new.

While the court may order the ALJ to consider additional evidence if the evidence is material, Plaintiff must also demonstrate that there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding." Schaal, 134 F.3d at 506; see also 42 U.S.C. § 405(g). Plaintiff's new evidence relates to a time period later than the date of the ALJ's decision, dealing with new issues that are not material to the conditions for which she applied for benefits. See Johnston v. Colvin, No. 13-CV-2710 (VEC) (FM), 2015 WL 657774, at *10 (S.D.N.Y. Feb. 13, 2015) (finding that the plaintiff's "new information related to a time period later than the date of the ALJ's decision" and thus was not admissible because plaintiff could not demonstrate good cause for not including it before).

Plaintiff's progress notes do not report anything new that the ALJ would not have had access to when determining her case and her new evidence regarding urinary incontinence and post-menopausal bleeding are not material. Thus, Plaintiff did not meet her burden of showing

how any of those medical records would have reasonably influenced the ALJ to decide her SSI application differently.

## A.    The ALJ's Five-Step Determination

While Plaintiff did not raise other objections to the ALJ's determination against her, the court still assesses the legality of the determination because it is the court's responsibility to liberally interpret the complaint of a pro se plaintiff. See Randazzo v. Barnhart, 332 F. Supp. 2d 517, 522 (E.D.N.Y. 2004).

### 1.    Step One

At step one, the court must ask if the ALJ correctly determined whether or not Plaintiff was engaging in substantial gainful activity. (See R. at 12.) It is undisputed that Plaintiff was not engaging in substantial gainful activity at the time she filed her SSI application, because she was not working at all. (Id. at 13.)

### 2.    Step Two

At step two, the court asks if the ALJ determined whether Plaintiff had a medically determinable impairment that is "severe" or a combination of impairments that is "severe." (Id. at 12.) The ALJ determined that Plaintiff suffered from the following severe impairments: cervical arthritis and levoscoliosis; chronic lumbar pain related to a lumbar strain; obesity; and depression. (Id. at 13.) The ALJ classified these impairments as severe because they caused more than a minimal limitation in the claimant's ability to perform basic work activities. (Id.) The rest of Plaintiff's impairments were classified as either non-severe or as non-medically determinable because the evidence did not support a finding of severe impairments. (Id. at 13-14.) These conditions include Plaintiff's hypertension, hyperlipidemia, vitamin D deficiency, diabetes, astigmatism, dry eyes, bilateral knee pain, anxiety, anemia, and an

undiagnosed abdominal disorder. (Id. at 13-14.) The court agrees with this classification of Plaintiff's impairments because the ALJ correctly applied the definition of "severe." (Id. at 12 (citing 20 C.F.R. § 416.921); see also id. at 13-14.)

### 3. Step Three

At step three, the court must ask if the ALJ correctly compared Plaintiff's impairments to those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, when determining if Plaintiff's impairments made her disabled. (Id. at 12) The ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1. Some of the relevant conditions in Appendix 1 are impairments to the musculoskeletal system and mental disorders.[2] 20 C.F.R. pt. 404, subpt. P, app. 1. The court concludes that the ALJ did not commit error.

SSA regulations provide that if the applicant has "an impairment(s) which meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s), [the SSA] will find [the claimant] disabled without considering [her] age, education, and work experience." See 20 C.F.R. § 416.920. Determinations at step three are "based solely on medical evidence." See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam) (internal quotation marks omitted)).

First, the Commissioner correctly found that the medical record did not provide evidence that Plaintiff's physical impairments resulted in a compromise of the nerve root or the spinal cord with evidence of nerve root compression characterized by motor loss, spinal arachnoiditis, or lumbar spinal stenosis. Therefore, her physical impairments did not result in an inability to ambulate effectively as defined in Appendix 1. (R. at 14.)

---

[2] The court agrees with the ALJ's determinations of what the relevant Appendix 1 impairments are in this case.

Second, the Commissioner correctly determined that Plaintiff's mental impairment did not satisfy the "paragraph B" criteria, which is a set of impairment-related functional limitations. He found that Plaintiff's mental impairment did not result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Id.) Based on the medical and opinion evidence, the ALJ determined that Plaintiff's mental impairments caused only mild restrictions in her activities of daily living; mild difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Id.) Based on the court's review of the record, this determination was not erroneous.

The court notes that the ALJ also listed Plaintiff's obesity as a severe impairment in step two, but did not expressly determine whether it qualified as a listed impairment. According to Appendix 1, the ALJ must consider any additional and cumulative effects of obesity on Plaintiff's musculoskeletal system. See 20 C.F.R. pt. 404, subpt. P, app. 1. Although the ALJ did not expressly analyze whether Plaintiff's obesity qualified as a listed impairment, the court notes the ALJ did perform a thorough analysis with respect to Plaintiff's cervical arthritis and levoscoliosis; chronic lumbar pain related to a lumbar strain; and depression, which are the main impairments reflected in Plaintiff's testimony and medical records. The ALJ contended Plaintiff suffers from back pain, obesity, and depression but none of these conditions—or some combination of them—equal the severity of the listed impairments found in 20 CFR Part 404, Subpart P, Appendix 1. (Id. at 14.)

Finally, a court may affirm an ALJ's step-three determination even though the ALJ did not give an express rationale but where there is sufficient, uncontradicted evidence in the record

20

to provide substantial evidence for the ALJ's conclusion. See Berry v. Schweiker, 675

F.2d 464, 468 (2d Cir. 1982). Based on its review of the record, the court notes that the ALJ

accounted for the effects of Plaintiff's obesity when determining her residual functional capacity

to perform work, because the ALJ included special requirements such as a sit/stand option to

accommodate Plaintiff's difficulties. (R. at 14-15.)

      4.    Step Four

At step four, the ALJ determined that Plaintiff had the residual functional capacity to

perform light work as defined in 20 C.F.R. 416.967(b) except:

> [Plaintiff] would require a sit/stand option that would allow
> [Plaintiff] to alternate sitting or standing position at 30 minute
> intervals throughout the day; [Plaintiff] could only occasionally
> climb ramps or stairs; never climb ladders, ropes, or scaffolds;
> occasionally stoop, kneel, crouch, or crawl; [Plaintiff] could not
> understand, carry-out, or remember any detailed instructions.

(Id. at 14-15.) In reaching this determination, the ALJ considered all of Plaintiff's symptoms and

the extent to which these symptoms could reasonably be accepted as consistent with the

objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 416.929

and S.S.R.s 96-4p and 96-7p. (Id. at 15.)

Indeed, this recommendation seems to take into account Plaintiff's obesity and her

claimed symptoms of numbness in the thighs, which could be a by-product of obesity's effect on

her musculoskeletal system and/or her cervical arthritis and levoscoliosis. The ALJ properly

followed the two-step process in which he must first determine whether there is an underlying

medically determinable physical or mental impairment—i.e., an impairment that can be shown

by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be

expected to produce the claimant's pain or other symptoms. (Id.) Second, once an underlying

physical or mental impairment, which could reasonably be expected to produce the claimant's

pain or other symptoms has been shown, the ALJ then evaluates the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. (Id.) If there is nothing in the medical record to support claims of the intensity and persistence of certain symptoms, the ALJ must make a finding on the credibility of the statements, based on a consideration of the entire case record. (Id.) After reviewing the entire case record, the ALJ determined that while Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible. (Id. at 15-16.)

Citing to Plaintiff's medical history, the ALJ determined the record contained little objective evidence that Plaintiff suffered from any chronic numbness or dysfunction in her upper or lower extremities as Plaintiff alleged at the hearing. (Id. at 16.) None of the medical records, doctor's opinions, or any of the X-rays could give a valid, medical explanation for her numbness. (Id.) Based on the evidence in front of him, the ALJ determined that while Plaintiff suffered from some lower back pain—which had recently developed and was supported by objective, medical evidence in the record—it would not limit her beyond light work. (Id.) In addition, while her obesity and some lower extremity edema could reasonably limit her ability to walk for a sustained period, she herself admitted in her testimony that she could walk three to five blocks to the store. (Id. at 17, 42.) While she had added that she would need to take breaks to rest, the ALJ factored in that accommodation when he added the sit/stand option every 30 minutes to Plaintiff's residual functional capacity. (Id. at 17.)

Typically, the ALJ is required to give deference to the opinion of the Plaintiff's treating physician on the issue of disability. Here, Dr. Grishina limited Plaintiff to walking less than two

22

blocks at a time, due to fatigue and pain in her legs. (Id. at 488.) While on the other hand, Dr. Caiati stipulated that Plaintiff had no limitations. (Id. at 17.) In this case, the court finds that the ALJ did not err in giving greater weight to the opinion of Dr. Caiati, the physical consultative doctor who determined that Plaintiff was not disabled, than to Dr. Grishina, one of Plaintiff's treating physicians. Under the SSA's regulations, "a treating physician's report is generally given more weight than other reports." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). A "treating physician" is a physician "who has provided the [claimant] with medical treatment or evaluation, and who has or who had an ongoing treatment and physician-patient relationship with the individual." Sokol v. Astrue, No. 04-CV-6631 (KMK) (LMS), 2008 WL 4899545, at *12 (S.D.N.Y. Nov. 12, 2008). The SSA's "treating physician rule" requires an ALJ to give a treating physician's opinion "controlling weight" if "the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c). On the other hand, "[w]hen other substantial evidence in the record"—such as other medical opinions—"conflicts with the treating physician's opinion, that opinion will not be deemed controlling." Snell, 177 F.3d at 133. In addition, "some kinds of findings—including the ultimate finding of whether a claimant is disabled and cannot work—are reserved to the Commissioner" and are, therefore, never given controlling weight. Id. (internal quotation marks omitted).

Even where an ALJ does not give controlling weight to a treating physician's opinion, the ALJ must assess several factors to determine how much weight to give the opinion. See 20 C.F.R. § 404.1527(c)(2). Specifically, the ALJ must assess "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the

opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998); see also 20 C.F.R. § 404.1527(c)(2)-(6). While an ALJ need not mechanically recite each of these factors, he or she must "appl[y] the substance of the treating physician rule." Halloran v. Bernhart, 362 F.3d 28, 32 (2d Cir. 2004). The court will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" or when the court "encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Id. at 33.

In this case, the ALJ did provide good reasons for giving more weight to Dr. Caiati's opinion than to Dr. Grishina's. Dr. Grishina had limited Plaintiff to walking less than two blocks at a time, due to fatigue and pain in her legs. (Id. at 488.) While the ALJ did not doubt that Plaintiff experienced some pain and difficulties with lower extremity edema, obesity, and neck pain, he determined that Dr. Grishina's opinion was not supported by the record as a whole. The ALJ was correct. First, there is no objective evidence indicating that Plaintiff suffered from any chronic pain in her lower extremities during her alleged period of disability. (Id.) Second, while Plaintiff's obesity and lower extremity edema could reasonably limit her abilities to engage in sustained walking, she herself acknowledged that she could walk three to five blocks to the store. (Id.) Third, in May 2012, Dr. Grishina described Plaintiff's edema as mild, which undercuts the persuasiveness of Plaintiff's argument that her edema prevented her from walking long distances. (Id.) Last, Dr. Grishina's opinion that Plaintiff could not walk due to pain is inconsistent with the findings of Dr. Caiati who noted no significant symptoms or limitations in her lower extremities. (Id.) Dr. Caiati noted that Plaintiff was able to perform a variety of tasks

without any pain or difficulty, and specifically noted that Plaintiff walked with a normal gait and stance, used no assistive devices, and could walk on her heels and toes without difficulty. (Id. at 193.) There is no objective medical evidence in the record which is consistent with Dr. Grishina's assessment. This led the ALJ to doubt Plaintiff's credibility as to the severity of her symptoms and allowed him to give more weight to Dr. Caiati's opinion over Dr. Grishina's.

Even if the court were to find that the ALJ erred by crediting Dr. Caitai's assessment more than Dr. Grishina's, the ALJ still considered Dr. Grishina's opinion by implementing a 30 minute sit/stand option in his recommendation and adopting the vocational expert's determination that Plaintiff could perform jobs with very little walking. Dr. Grishina limited Plaintiff to walking two blocks at a time. He placed no limit on total activity. By examining Plaintiff's job options if she could take sitting breaks, the ALJ addressed Dr. Grishina's concerns. Therefore, even if crediting Dr. Caiati's assessment was erroneous, the ALJ's ultimate determination was not erroneous because his determination of Plaintiff's residual functional capacity to perform light work is still consistent with Dr. Grishina's assessment. See Schisler v. Bowen, 851 F.2d 43, 46 (2d Cir. 1988) ("[M]edical opinions will be considered in the context of all the medical and other evidence in making that decision.").

The ALJ agreed with Plaintiff that she could not perform her past work as a home health aide; however, he did not agree with Plaintiff that she was incapable of performing less strenuous work. (R. at 17.) The ALJ reported, "[w]hen asked why she could not perform less strenuous work, the claimant testified that she cannot work because she has no one to care for her daughter, explaining that she cannot leave her daughter alone . . . [because she] is autistic." (Id.) While the ALJ expressed "[sympathy] with the claimant's dilemma," having to take care of an autistic child is not a valid reason to grant disability benefits. (Id.) Plaintiff engages in a variety of

activities daily, from going to appointments, shopping, cooking, and performing household chores. (Id.) While she may need to take breaks due to fatigue, the ALJ correctly determined that because Plaintiff is able to engage in light work such as household chores, she should be able to perform light work in the workforce. (Id.)

With regard to Plaintiff's mental impairment, the court agrees with the ALJ that the objective medical evidence and Plaintiff's treatment history do not support her allegations of disabling symptoms. (Id. at 18.) Plaintiff's depression mildly interferes with her daily activities, and Plaintiff even acknowledged that her depressive symptoms have responded to medication. (Id.) She is still able to go to the store, go to multiple appointments, and maintain a relationship with her family, all of which require a certain degree of normal social functioning and of which she is able to sustain despite her depression. (Id.)

### 5. Step Five

The court agrees with the ALJ's conclusion, which was based on the vocational expert's testimony, that a hypothetical individual of Plaintiff's age and background with a residual functional capacity to perform light work would be capable of employment as a parking lot attendant, a price marker, and a ticket seller. In reaching this conclusion, the ALJ considered the entire record, including Plaintiff's description of her symptoms and the extent to which those symptoms could be reasonably accepted as consistent with the objective medical evidence. (Id. at 15-19.) See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979) ("[T]he ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."). The ALJ determined that the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles, with the exception of the

sit/stand option that the ALJ included in his assessment of Plaintiff's residual functional capacity. (R. at 20.) This determination is supported by the medical evidence in the record and the ALJ's assessment of Plaintiff's credibility. (Id. at 20-21)

## V. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is GRANTED. Plaintiff's cross motion for judgment on the pleadings is DENIED. The Clerk of Court is respectfully directed to enter judgment for the Commissioner and to close this case.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
May 9 , 2016

NICHOLAS G. GARAUFIS
United States District Judge